UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA,          )
                                                    )
v.                                                  )
                                                    )         Criminal No. 05-cr-10168-DPW
DANIEL TUNNELL,                            )
                                                    )
          Defendant.                          )
_____)

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Daniel Tunnell ("Tunnell"), hereby submits this Sentencing

Memorandum.

## INTRODUCTION

Tunnell was a manager for the Framingham, Massachusetts sales office of Computer

Associates, Inc. ("CA"), a large software company.  CA had a policy prohibiting managers from

receiving sales commissions.  Tunnell possessed great sales skills, and was instrumental in

closing a number of sales.  To recognize the value of Tunnell's contributions – the  sales would

not have taken place without Tunnell's efforts – various salespeople and Tunnell agreed to split

the commissions.  Tunnell was not oblivious to the tax implications of these commission splits,

as he directed the salespeople to pay the tax on the full amount of the commission checks, and

then divide the post-tax balance with Tunnell.  As detailed fully below, more than $20,000 in

taxes was paid on Tunnell's portion of the commission checks.  Had the payments been made at

his higher incremental rate, an additional $6,955.76 in taxes would have been paid.

Under the Sentencing Guidelines, the only dispute in this case relates to the amount of the

"tax loss" for purposes of U.S.S.G. § 2T1.1.  The government contends that the "tax loss" should

be $27,003.78 – the amount that Tunnell should have paid on his portion of the commissions. However, that is an erroneous interpretation of the phrase "tax loss," and the correct figure is $6,955.76, the difference between what should have been paid on Tunnell's portion of the commissions, and what was actually paid.

The difference in tax loss is significant under the Guidelines:  If the government's view were correct, Tunnell would fall into Zone B, and the government would recommend a sentence of probation with a condition of home detention.  In contrast, if the lower tax loss figure applied, Tunnell would fall into Zone A, and would be eligible under the Guidelines for a sentence of "straight" probation.

This Memorandum will provide information about Tunnell, his prompt decision to enter a guilty plea in this case and satisfy his tax obligations, and his truthful cooperation with prosecutors in the Eastern District of New York.  It will then explain why the correct "tax loss" in this case is $6,955.76, the amount of the shortfall to the Treasury, and that based on that figure Tunnel should receive a sentence of two years probation.  Finally, it will explain that irrespective of the resolution of the Guideline issue, the appropriate sentence under 18 U.S.C. § 3553(a) is two years probation.

## **FACTS**

Tunnell is 32 years old and resides in Birmingham, Alabama.  He has been married for eight years to his wife, Kelly; they have a two-year old son named Luke.  The Tunnells have a good marriage, and Daniel is a very devoted father.

Tunnell has worked in a variety of sales positions for software companies.  He is currently employed as the General Manager – North America for Finjan, a provider of web

security solutions.  He is responsible for sales, support, services and marketing.  In that capacity he travels approximately three days per week.

## CA

Tunnell worked for CA as the head of its Framingham sales office in 2001 and 2002.  A number of the salespeople in that office encountered difficulties making sales to particular accounts, and Tunnell stepped in and quite literally salvaged the sales – and the resulting commissions.  In recognition of his contributions, the salespeople listed on the following page agreed to split commissions with him in situations where Tunnell also helped close the deals.  Tunnell wanted to ensure that taxes were paid on the commission checks, and he and the salespeople agreed that each salesperson would pay the tax on the full amount of the commission, and Tunnell and the salesperson would then evenly split the net amount (after tax).

For example, in 2001 a salesperson, Steven Berube ("Berube"), split a $7,650 commission with Tunnell.[1]  Berube, whose marginal tax rate was 27.50%, paid $1,650 in taxes, which represented $825 for his share and $825 for Tunnell's share.  Tunnell and Berube then split the after-tax amount ($6,000) evenly, with Tunnell receiving $3,000.  Tunnell did not report his receipt of that amount – or the other split commissions he received – on his 2001 and 2002 federal income tax returns.

Tunnell's marginal tax rate was higher than Berube's – or any of the involved sales people – 39.10% in 2001 and 35.0% in 2002.  Had tax been paid on the portion of the commission at Tunnell's marginal rate rather than Berube's lower rate, the tax on that portion would have been $1,173.  The difference between that amount and the amount Berube paid ($825) represents the tax loss attributable to that commission payment, $348.00.  Aggregating

---

[1] The government and Tunnell have stipulated to the accuracy of the facts relating to the salespeople, the checks split with Tunnell, and the taxes paid on those checks.

the tax losses attributable to each of the commissions, as set forth in the table below,

demonstrates that the Treasury received $6,955.76 less than would have been appropriate.

### 2001[2]

| INDIVIDUAL | AMOUNT RECEIVED BY TUNNELL | TAX BRACKET PERCENTAGE | TAX PAID ON AMOUNT | TUNNELL TAX BRACKETT | TUNNELL TAX LIABILITY ON AMOUNT | DIFFERENCE |
|---|---|---|---|---|---|---|
| Berube, Steven | $ 3,000.00 | 27.50% | $ 825.00 | 39.10% | $ 1,173.00 | $ 348.00 |
| Astor, M. Pat | $15,818.00 | 27.50% | $4,349.95 | 39.10% | $ 6,184.84 | $1,834.89 |
| Lenihan, David[3] | $20,145.00 | 27.50% | $5,539.88 | 39.10% | $ 7,876.70 | $2,336.82 |
| Olivieri, Lou | $ 7,000.00 | 27.50% | $1,925.00 | 39.10% | $ 2,737.00 | $ 812.00 |
| Surette, Douglas | $ 5,100.00 | 30.50% | $1,555.50 | 39.10% | $ 1,994.10 | $ 438.60 |
| **TOTALS** | **$51,063.00** | | **$14,195.33** | | **$19,965.63** | **$5,770.31** |

### 2002

| INDIVIDUAL | AMOUNT RECEIVED BY TUNNELL | TAX BRACKET PERCENTAGE | TAX PAID ON AMOUNT | TUNNELL TAX BRACKETT | TUNNELL TAX LIABILITY ON AMOUNT | DIFFERENCE |
|---|---|---|---|---|---|---|
| Singer, Eugene | $ 500.00 | 27.00% | $ 135.00 | 35.00% | $ 175.00 | $ 40.00 |
| Berube, Steven | $ 3,000.00 | 27.00% | $ 810.00 | 35.00% | $1,050.00 | $ 240.00 |
| Sciacca, Michael | $ 1,000.00 | 30.00% | $ 300.00 | 35.00% | $ 350.00 | $ 50.00 |
| Alessi, Thomas | $ 2,500.00 | 27.00% | $ 675.00 | 35.00% | $ 875.00 | $ 200.00 |
| Surette, Douglas | $13,109.00 | 30.00% | $3,932.70 | 35.00% | $4,588.15 | $ 655.45 |
| **TOTALS** | **$20,109.00** | | **$5,852.70** | | **$7,038.15** | **$1,185.45** |

---

[2] Information in the table was provided to undersigned counsel by AUSA Adam Bookbinder , who reports that the information was compiled by IRS-CID Special Agent Jonathan Wlodyka.

[3] Indeed, with respect to the commission split with Mr. Lenihan, Tunnell and Mr. Lenihan actually consulted a certified public accountant who advised them that Mr. Lenihan should withhold 40% of Tunnell's share of the taxes. Mr. Lenihan did so, and as a result the tax loss resulting from the Lenihan commission was, in fact, zero.  However, for purposes of the Guidelines, the Court need not wade into this issue, as the Guideline range of 0-6 months remains unchanged and Tunnell is obligated under the plea agreement to acknowledge that the tax loss is in excess of $5,000.

BST99 1507580-1.073063.0011

With a tax loss of $6,955.76, the base offense level should be 10.  See U.S.S.G. § 254.1(C).

To be sure, the commission split was contrary to CA's policy, and when it came to light Tunnell was terminated.  However, the commission split arrangements were primarily about circumventing that policy, and only incidentally about taxes, and the $6,955.76 represents the tax loss to the government – the actual shortfall resulting from Tunnell's offense.

## TUNNELL ACCEPTS RESPONSIBILITY

From the earliest stages of the investigation, Tunnell understood that he needed to take responsibility for his actions.  A pre-indictment plea agreement was reached and Tunnell waived indictment and pleaded guilty.  Tunnell directed counsel to negotiate a prompt resolution of his civil tax liabilities, and those liabilities have been resolved.  He paid the full amount of the 2002 tax liability to the Internal Revenue Service on May 5, 2006.  With respect to the 2001 tax year, which is outside the civil statute of limitation, Tunnell offered to pay this amount as restitution in advance of sentencing.  Assistant United States Attorney Bookbinder advised undersigned counsel, however, that in spite of Tunnell's willingness to pay, no government agency or arm of the courts can accept payment absent an order of restitution.  Such an order should enter at sentencing, and Tunnell will pay the restitution promptly thereafter.

## COOPERATION

Top management at CA was involved in schemes to pump up its revenue numbers and boost its stock price.  Tunnell was not involved in this fraud, but knew about aspects of it.  He voluntarily decided to cooperate with federal prosecutors in the Eastern District of New York, and provided them with truthful and complete information.  They were prepared to call Tunnell as a possible rebuttal witness at the trial of two former top CA executives, but the defendants pleaded guilty and there was no trial.

## IMPACT

Tunnell has paid a steep price for his actions. He was immediately terminated by CA upon discovery of the commission splits. He subsequently became employed by a company called Nexidia, Inc., but lost that job – in spite of outstanding performance – as a result of the publicity surrounding these charges.

Beyond the financial impact, Tunnel must live with the enduring humiliation and damage to his reputation resulting from his own poor choices. This felony conviction will follow him around for the rest of his life.

## THE SENTENCING FRAMEWORK

In United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), the court set forth the framework for sentencing in the aftermath of United States v. Booker, 543 U.S. 220 (2005). It indicated that a district court should first calculate the guideline sentence and determine whether a departure is warranted. 440 F.3d at 516. Having engaged in that analysis, the court should then determine whether a non-guideline sentence is warranted by the factors set forth in 28 U.S.C. § 3553(a). Id.

## THE SENTENCING GUIDELINES

The only disputed issue relating to the Guidelines is the amount of the tax loss. The Probation Office asserts that the tax loss is $27,189; this amount represents the amount of tax that it says Tunnell should have paid on his share of the commissions. This results in a base offense level of 12, U.S.S.G. § 2T1.(a)(1) and § 2T4.1(D), and after the reduction for acceptance of responsibility, a total offense level of 10.

- 6 -

As stated above, Tunnell believes that the correct tax loss is $6,955.76, as such amount represents the actual loss to the Treasury. At this amount the base offense level would be 10, and with the reduction for acceptance of responsibility the total offense level would be 8.

The "tax loss" for subscribing to a false tax return is "the total amount of the loss that was the object of the offense…" U.S.S.G. § 2T1.1(c)(1). The 1993 amendments to the tax guidelines allow the Court "to inquire into the actual tax burden" and expands "the authority of the court . . . to accept proof showing a lesser amount of taxes is owed." United States v. Minneman, 143 F.3d 274, 283 (7th Cir. 1998). Such an inquiry is required because the base offense level for tax offenses "is driven by the tax loss inflicted on the government." United States v. Brennick, 134 F.3d 10, 13 (1st Cir. 1998). "Tax loss under U.S.S.G. § 2T1.1 is intended to reflect the revenue loss to the government from the defendant's behavior." United States v. Gordon, 291 F.3d 181, 187 (2nd Cir. 2002).

Owing to the peculiar nature of this offense – where the defendant made an attempt, albeit incomplete, to ensure that taxes on his income were paid – the shortfall to the treasury is $6,955.76, the difference between the amount of taxes paid and what should have been paid. This sum is the "tax loss," results in a base offense level of 10 and, after acceptance of responsibility, a total offense level of 8.

With a criminal history category of I and an offense level of 8, the Guideline Sentencing Range is 0-6 months. (Zone A.)

## THE SECTION 3553(a) ANALYSIS

The Sentencing Guidelines are "an important consideration in sentencing," but they are not controlling. See United States v. Jimenez-Beltre, 440 F.3d at 518. Instead, the Court should

- 7 -

impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

In this case the guideline range of 0-6 months supports defendant's recommended sentence of 24 months probation. The statutory factors enumerated in Section 3553(a) militate in favor of such a sentence.

Indeed, Tunnell's entire course of conduct since the inception of the investigation has been directed at making things right with the government. He entered into a preindictment plea agreement, waived indictment and pleaded guilty. He voluntarily repaid his 2002 tax liability soon after pleading guilty, and offered to pay the entire 2001 amount as well, even though in the ordinary course the Internal Revenue Service would not have even commenced its collection efforts until long after sentencing. Finally, he cooperated truthfully and completely in the government's prosecution of senior CA executives. While that cooperation has not resulted in the filing of a motion pursuant to U.S.S.G. §5K1.1, it can properly be considered by the Court in sentencing Tunnell. See 18 U.S.C. § 3553(a)(1) (court shall consider history and circumstances of the defendant).

- 8 -

## CONCLUSION

The Court should sentence Daniel Tunnell to 24 months probation.  No greater sentence is required under the Guidelines or Section 3553(a).  Twenty-four months probation would represent a fair, just and legally authorized sentence.

Respectfully submitted,

DANIEL TUNNELL,
By his attorney,


/s/  Mark W. Pearlstein
Mark W. Pearlstein (BBO #542064)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA  02109
(617) 535-4000

Dated:  June 28, 2006


## CERTIFICATE OF SERVICE PURSUANT TO L.R. 5.2(b)

I, Mark W. Pearlstein, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 28, 2006.


  /s/ Mark W. Pearlstein
Mark W. Pearlstein

BST99 1507580-1.073063.0011